UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 12 CR 887 |
| v. | ) | |
| | ) | Chief Judge Rubén Castillo |
| ANTONIO WILLIAMS and JOHN T. HUMMONS | ) ) ) | |

## MEMORANDUM OPINION AND ORDER

Antonio Williams and John T. Hummons (collectively, "Defendants") are charged with conspiracy to commit robbery in violation of 18 U.S.C. § 1951(a), conspiracy to possess with intent to distribute narcotics in violation of 21 U.S.C. § 846, possession of a firearm in furtherance of a crime of violence or a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A), and possession of a firearm after having previously been convicted of a felony in violation of 18 U.S.C. § 922(g)(1).[1] Presently before the Court is Williams's motion to suppress audio and video recordings of his conversation with his codefendants while they were in the police squadrol and the incriminating statement Hummons made during interrogation, (R. 56, Defs.' Mot.), which Hummons has joined and adopted, (R. 52, Hummons's Mot. Adopt; R. 57, Min. Entry). The Court held an evidentiary hearing and heard testimony from Chicago Police Department Officer Daniel Conway, who is a task force officer detailed to the Bureau of Alcohol, Tobacco, Firearms & Explosives (the "ATF"), and ATF Special Agent Christopher Labno. (R. 68, Min. Entry.) Pursuant to Federal Rule of Criminal Procedure 12(d), the Court now states its findings of fact and conclusions of law. For the reasons set forth below, Defendants' motion is granted in part and denied in part.

---

[1] Codefendant Howard Lee is also charged with the first three counts.

## RELEVANT FACTS[2]

The facts of this case will seem redundant to anyone familiar with the phony stash house scheme the ATF has used over the past few years.[3] Over the course of eight days in November 2012, the ATF Chicago Field Division and the Chicago Police Department investigated Defendants. On November 7, 2012, a confidential source informed ATF agents that Williams had recently conducted armed robberies and was interested in conducting future armed robberies. Later that same day, the source arranged a meeting between Williams and the agent. On November 7 and 8, 2012, an undercover agent met with Williams to plan the robbery of a nonexistent narcotics trafficking organization's stash house. The undercover agent posed as a drug courier for the organization who was seeking assistance in robbing the house. Williams recruited Hummons and Lee to help. Over the course of the next week, there were additional meetings and communications between Defendants, Lee, and ATF agents related to their planned robbery of the phony stash house.

On November 14, 2012, Williams, Hummons, and Lee drove to a forest preserve in Lyons, Illinois to prepare for the robbery. Soon after their arrival, they were arrested and placed in the back of a Chicago Police Department squadrol or paddywagon. They were not given any

---

[2] These facts are drawn from the testimony Officer Conway and Special Agent Christopher Labno gave at the evidentiary hearing on July 31, 2013, (R. 68); the complaint for the indictment, (R. 1); and undisputed facts provided in Defendants' motion to suppress, (R. 56).

[3] *See, e.g., United States v. Kindle*, 698 F.3d 401, 414 (7th Cir. 2012), *reh'g en banc granted, opinion vacated* (Jan. 16, 2013), *cert. denied*, 133 S. Ct. 1743 (2013) (Posner, J., concurring and dissenting) ("[S]uch stings are a disreputable tactic. Law enforcement uses them to increase the amount of drugs that can be attributed to the persons stung, so as to jack up their sentences."); *United States v. Lewis*, 641 F.3d 773, 777 (7th Cir. 2011) ("We have seen versions of this sting, which appears a bit tawdry . . . because the tired sting operation seems to be directed at unsophisticated, and perhaps desperate, defendants who easily snap at the bait put out for them[.]" (internal citations omitted)); *United States v. Corson*, 579 F.3d 804, 806 (7th Cir. 2009) ("If judges sat in a policy-making role, perhaps we might have reason to wonder whether this scheme was the right use of law enforcement resources.").

*Miranda* warnings at this time. As each suspect was placed into the squadrol, he was asked his name and how to spell it, his address, and his birthdate. Officer Conway testified that these questions are asked in the squadrol so the suspects' voices may be identified on the audio recordings. Hummons was also asked about the location of his cell phone. The arrestees answered the questions tersely without volunteering any additional information. The squadrol was well-marked as a Chicago Police vehicle. No officer accompanied the arrestees in the back of the squadrol; they were seemingly alone. Unbeknownst to them, the Chicago Police Department uniform shirt that was hanging in the back of the squadrol concealed a pinhole camera—a video camera that is smaller than a button. Another camera was hidden in the grating above the partition wall, and a microphone was also hidden. No ATF agent or Chicago Police officer sought a warrant to make these preplanned recordings.

Surreptitiously recording suspects in squadrols is a somewhat regular practice by the Chicago ATF. The recording equipment is provided by the ATF on an investigation-by-investigation basis. Although the recording equipment had the functionality to allow for simultaneous listening, that function was not activated. Thus, when the squadrol arrived at the station, the recordings had to be downloaded from the recording devices onto disks. Officer Conway testified that downloading each of the two video recordings would take approximately 35 to 45 minutes and that downloading the audio recording would take approximately 20 to 25 minutes. Officer Conway made copies of the recordings for the case agents; he testified that he had no interaction with the agents who were interviewing the arrestees.

The squadrol had three compartments: two separate rear compartments for prisoners and a separate cab compartment for the driver and passenger. Williams, Hummons, and Lee were placed in the middle compartment—the front prisoner compartment—directly behind the cab

compartment. The bench on which the suspects were sitting was on the front wall of the middle compartment, so that the arrestees were facing backwards with their backs against the front wall. There were two windows covered by metal grating on the front wall of the middle compartment. One was slightly above eye level and behind the heads of passengers seated on the bench in the middle compartment and looked out over the cab compartment. The other was at hip level for seated passengers and looked into the cab right behind the headrests of the seats in that compartment. The windows were made of thick plexiglass, and the window that looked into the cab was not shared by the cab. The suspects were oriented back-to-back with the officers in the cab compartment, but there was space between the thick window of the back compartment and the window of the cab. Officer Conway testified that individuals in the cab compartment can see through the window into the back compartment, but they cannot hear through it, and vice versa.

Once the squadrol arrived at the ATF office, the suspects were taken into interview rooms. Special Agent Labno interviewed Hummons with two other agents. Agent Labno advised Lee of his *Miranda* rights at the start of the interview. Agent Labno read and explained the waiver of rights form to Hummons, who then signed it. Agent Labno did not believe that Hummons's responses were honest, and he left the room to speak with other agents to find out if there was any additional information about Hummons he could use in the interview. He was advised that Hummons's participation in the pre-robbery meetings had been taped. Agent Labno knew the squadrol was wired from his briefing earlier in the day, and he asked other agents about the squadrol recordings but was given no information. When Agent Labno returned to the interview room, he told Hummons that the squadrol was wired. Agent Labno told Hummons that he thought Hummons was lying and indicated that he had information that led him to believe as much. Agent Labno also told Hummons that his codefendants were cooperating and that they

4

identified him as the owner of one of the recovered guns. Agent Labno testified that these were bluffs he used to try to extricate more information from Hummons, although he admitted that he knew that the squadrol had been wired. Hummons then said that the information Agent Labno claimed to have received from his codefendants was untrue and stated that he would tell the truth about what happened. Hummons explained his version of the events of the day. Agent Labno read Hummons the rights listed on a consent to search form and asked Hummons if he understood his rights. Hummons stated that he did and he signed the form consenting to a search of his cellular phone. Hummons then wrote a four-page incriminating statement explaining what happened.

## DISCUSSION

Defendants argue that the surreptitious recording of their conversation in the squadrol violated the Fourth and Fifth Amendments of the Constitution, and the statements made therein should therefore be suppressed. (R. 56, Defs.' Mot. at 1.) Defendants also contend that Hummons's post-arrest interview statement was tainted by the unlawful recordings and should be suppressed as well. (*Id.*)

### I. Whether the recording constitutes an unreasonable search in violation of the Fourth Amendment

Defendants argue that their Fourth Amendment rights to be free from unreasonable search were violated when agents surreptitiously recorded their conversation in the squadrol. (R. 56, Defs.' Mot. at 6.) Defendants contend that the Fourth Amendment and Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III"), 18 U.S.C. § 2511, forbid the recording of their conversation without a warrant or their consent. (*Id.* at 6-7.) Defendants contend that suspects "do not automatically relinquish their constitutional rights upon arrest,"

and law enforcement agents cannot "unilaterally curtail their Fourth Amendment rights." (R. 72, Defs.' Post-Hearing Mem. at 9.)

The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause[.]" U.S. Const. amend. IV. A search within the meaning of the Fourth Amendment occurs only when "a reasonable expectation of privacy" exists, and a defendant who objects to a search bears the burden of demonstrating that a reasonable expectation of privacy was violated by the search. *See United States v. French*, 291 F.3d 945, 951 (7th Cir. 2002); *United States v. Ruth*, 65 F.3d 599, 604 (7th Cir. 1995). It is well-established that electronic surveillance can constitute a search for the purposes of the Fourth Amendment. *See Katz v. United States*, 389 U.S. 347, 353 (1967). Title III, the federal wiretap law, limits the government's ability to eavesdrop on communications a person expected to keep private without a wiretap warrant. *Matter of John Doe Trader No. One*, 894 F.2d 240, 242 (7th Cir. 1990). The legislative history of Title III indicates that the "expectation of privacy" it protects is "intended to parallel the 'reasonable expectation of privacy' test created by the Supreme Court in *Katz v. United States*." *Id.* (citation omitted). In Justice Harlan's oft-quoted concurrence, he stated that "there is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'" *Katz*, 389 U.S. at 361 (Harlan, J., concurring).

Defendants contend that they had a reasonable expectation of privacy in their conversation in the squadrol regarding their recent arrest, and thus the recording of their conversation should be suppressed. (R. 56, Defs.' Mot. at 6.) The government argues that Defendants' expectation of privacy in the squadrol was unreasonable.

### A. Subjective expectation of privacy

The first prong of the *Katz* standard is whether the individual who claims his Fourth Amendment rights have been violated has demonstrated an actual subjective expectation of privacy. "In determining whether a defendant held a subjective expectation of privacy, we look at the defendant's efforts to conceal and keep private that which was the subject of the search." *United States v. Villegas*, 495 F.3d 761, 767 (7th Cir. 2007); *see also United States v. Yang*, 478 F.3d 832, 835 (7th Cir. 2007) ("[A]n individual claiming a subjective expectation of privacy must *exhibit* that expectation[.]" (emphasis added)).

The government argues that Defendants fail to demonstrate that they took "affirmative steps to conceal and keep private" their conversation in the squadrol. (R. 60, Gov't's Resp. at 8) (quoting *Yang*, 478 F.3d at 835). Defendants contend that they spoke softly to one another only when the squadrol door was shut in order to avoid being overheard. (R. 56, Defs.' Mot. at 9.) The government contends that lowering their voices is insufficient, and Defendants' "failure to speak quietly enough to avoid being heard does not" constitute an affirmative step demonstrating a subjective expectation of privacy. (R. 60, Gov't's Resp. at 8-9.) The Court disagrees. The video recordings show that Defendants did not speak when the squadrol doors were open or when an officer was present, and when they did speak, they lowered their voices more than would be necessary to prevent officers outside the squadrol from hearing their conversation. These actions indicate that Defendants expected their conversation to go unheard and took affirmative steps to ensure as much. In addition, both Defendants submitted affidavits attesting that they did not know their conversation was being recorded and that they expected their conversation to be private because the prisoner compartment was a "separate enclosed area." (R. 62-1, Williams Decl.; R. 64-1, Hummons Decl.)

7

It is not only Defendants' actions that inform the Court's conclusion; the law enforcement officers' actions also indicate that Defendants had a subjective expectation of privacy. The government stipulated at the suppression hearing that the recording devices were deliberately hidden, and Officer Conway's testimony made it clear that the devices were virtually invisible. If the law enforcement officers had not suspected that Defendants would have an expectation of privacy when they were unaccompanied in the prisoner compartment of the squadrol, they would not have used such small and carefully concealed recording devices. The Court concludes that the conduct of both Defendants and the government demonstrates that Defendants had a subjective expectation of privacy in their conversation in the squadrol.

### B. Reasonable expectation of privacy

The second prong of the *Katz* test concerns whether Defendants' subjective expectation of privacy was objectively reasonable. A finding that an expectation of privacy is reasonable "recognizes the everyday expectations of privacy that we all share." *Minnesota v. Olson*, 495 U.S. 91, 98 (1990). The "inquiry into whether a defendant's expectation of privacy was reasonable is necessarily fact dependent, and 'whether a legitimate expectation of privacy exists in a particular place or thing' must be determined on a case-by-case basis." *Villegas*, 495 F.3d at 767 (quoting *United States v. Waller*, 426 F.3d 838, 844 (6th Cir. 2005)) (citing *United States v. Smith*, 978 F.2d 171, 180 (5th Cir. 1992)) (internal citations omitted).

The government argues that, having been arrested by 30 to 40 armed law enforcement officers and placed in a marked police vehicle, no subjective expectation of privacy Defendants may have had was reasonable. (R. 76, Gov't's Post-Hearing Mem. at 12.) Although the Seventh Circuit has not addressed this question, the government cites several cases in which circuit courts have held that there is no reasonable expectation of privacy in a police car. (R. 60, Gov't's Resp.

at 9-10) (citing *United States v. Fridie*, 442 F. App'x 839, 841 (4th Cir. 2011) (per curiam); *United States v. Dunbar*, 553 F.3d 48, 57 (1st Cir. 2009); *United States v. Turner*, 209 F.3d 1198, 1200-01 (10th Cir. 2000); *United States v. Clark*, 22 F.3d 799, 801-02 (8th Cir. 1994); *United States v. McKinnon*, 985 F.2d 525, 528 (11th Cir. 1993)). Defendants argue that it "is not dispositive that the conversation took place in a police-owned vehicle" because the Fourth Amendment protects people, not places. (R. 72, Defs.' Post-Hearing Mem. at 9.)

The present case differs from the cases the government cites, in which courts have found no reasonable expectation of privacy in a patrol car, for several reasons. Importantly, none of those cases deal with squadrols, only police cars. As far as the Court can tell, the question of whether a suspect has a reasonable expectation of privacy in the back of a squadrol is one of first impression among federal courts. On this question of first impression, the Court declines to apply the caselaw relating to patrol cars, as the government requests, without scrutinizing the analysis to determine if that same analysis applies equally to the circumstances at issue here. Some of the cases the government cites give no reasoning for their holding that an individual has no reasonable expectation of privacy in a patrol car and simply cite other cases without explanation. *See Fridie*, 442 F. App'x at 841 ("And, finally, Fridie did not have a reasonable expectation of privacy in a conversation in which he engaged while seated in the officer's patrol car." (citing generally *McKinnon*, 985 F.2d 525)); *Dunbar*, 553 F.3d at 57 ("For the reasons already expressed by our sister circuits, we hold that the back of a police car is not a place where individuals can reasonably expect to communicate in private." (citing *Turner*, 209, F.3d at 1201; *Clark*, 22 F.3d at 801-02; *McKinnon*, 985 F.2d at 528)). Similarly, the first federal circuit court to consider the issue did not provide a reason that might guide this Court's analysis. Instead, the Eleventh Circuit cited "one federal district court and several state courts [that had] held that no

9

reasonable expectation of privacy exists in the back seat area of a police car" before it concluded that the defendant failed to prove that he had a reasonable expectation of privacy. *McKinnon*, 985 F.2d at 527-28.

The Court thus seeks guidance from the thorough analysis provided by the Eighth and Tenth Circuits in *Clark* and *Turner*; the Court finds, however, that the analysis in those cases does not apply here. In *Turner*, the Tenth Circuit explained that, "the practical realities of the situation should be apparent to occupants. Patrol cars bristle with electronics, including microphones to a dispatcher, possible video recording with audio pickup, and other electronic and recording devices." 209 F.3d at 1201.

This Court finds police patrol cars are different from police squadrols. (*See* Gov't Ex. 1, Vehicle Photos 1-5.) In contrast to the back seat of a patrol car, the prisoner compartments of the squadrol are fully enclosed, completely separate from the cab compartment, and inaccessible to the public. In their compartment, Defendants were not within earshot of officers in the front compartment, nor were there visible recording or transmitting devices. The rear compartments of a squadrol do not "bristle with electronics." *See id.* The Tenth Circuit specifically limited its finding that the defendant's expectation of privacy was unreasonable *in a patrol car. See id.* at 1200-01 ("society is not prepared to recognize an expectation that communications *in a patrol car, under facts presented here*, are not subject to interception") (emphasis added). The factual dissimilarities between a squadrol and a patrol car are legally significant, and "the practical realities" of those differences were apparent to Defendants. *See id.* at 1201.

In *Clark*, the Eighth Circuit distinguished the back seat of a patrol car from the phone booth in *Katz*. 22 F.3d at 801. The court stated that a marked police car "is essentially the trooper's office, and is frequently used as a temporary jail for housing and transporting arrestees

10

and suspects." *Id.* at 801-02. Quoting *Clark*, the government contends that "[r]egardless of the physical configuration of the transport vehicle, its use in the course of this investigation was 'for the express purpose of ferreting out crime,' and thus Defendants had "no reason to believe that the prisoner compartment of the transport vehicle was 'a sanctuary for private discussions.'" (R. 76, Gov't's Post-Hearing Mem. at 12.) To the extent that the physical characteristics of the vehicle matters, the government urges the Court to regard the squadrol "as a mobile jail cell in which defendants likewise enjoyed no reasonable expectation of privacy." (*Id.* at 13) (citing *Hudson v. Palmer*, 468 U.S. 517, 523 (1984); *Lanza v. New York*, 370 U.S. 139, 143 (1962)).

Accepting the government's analogy does not require the Court to find that Defendants had no reasonable expectation of privacy. The Supreme Court has held that "prisons are not beyond the reach of the Constitution." *Hudson*, 468 U.S. at 523. Although the Court in *Hudson v. Palmer* concluded that an inmate's "right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order," *id.* at 527-28, it reiterated that prisoners are to be accorded whatever rights are "not fundamentally inconsistent with imprisonment itself or incompatible with the objectives of incarceration," *id.* at 523. "Determining whether an expectation of privacy is 'legitimate' or 'reasonable' necessarily entails a balancing of interests." *Id.* at 527. The curtailment of certain rights in prisons is necessary to ensure the safety of staff, visitors, and inmates: prison staff "must be ever alert to attempts to introduce drugs and other contraband" into prisons; "they must be vigilant to detect escape plots," and they must "maintain as sanitary an environment for the inmates as possible." *Id.* The Supreme Court found that these efforts justify intrusion into inmates' right to privacy. *Id.* This Court cannot imagine that the safety concerns related to handcuffed suspects in a

11

squadrol are comparable, and the government has failed to explain what interests justified an intrusion into Defendants' expectation of privacy within the squadrol.

Indeed, if the officers had had legitimate safety concerns that necessitated audio and video surveillance—if they were concerned that the suspects would somehow loosen their restraints so they could ambush the officers who opened the door or would inflict physical violence upon each other, or if they were concerned that on the lengthy drive to the ATF office the unaccompanied suspects may suffer some sort of medical distress with no way to signal the officers in the front compartment and receive help—then the recording devices' ability to transmit footage in real time would have been activated. The government has not offered any reason for the hidden recording of the suspects' conversation in the police squadrol. It has not claimed that it was investigating a potentially related crime or that it thought the suspects might reveal information that would help the officers secure public safety. Instead, the Court must conclude that the only reason for the recordings was to try to capture the suspects' confessions. This is not an interest that justifies an intrusion on Defendants' expectation of privacy. *See generally id.*; *Wong Sun v. United States*, 371 U.S. 471, 483-84 (1963). Accordingly, the Court rejects the government's argument and the analysis in *Clark* that a police vehicle is equivalent to a "mobile jail cell" in terms of an individual's reasonable expectation of privacy.

Finally, the Court notes that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment." *Katz*, 389 U.S. at 357. According to both Officer Conway and Agent Labno, not one of the approximately 50 agents at the briefing meeting in preparation for this arrest raised the issue of obtaining a warrant. The most appropriate time for judicial review of wiretaps is before, not after the fact. *See id.* at 356-57. The more intrusive the search is, the "more insistent" courts

12

should be that a warrant be obtained. *United States v. Torres*, 751 F.2d 875, 882 (7th Cir. 1984). It is "unarguable" that surreptitious video and audio surveillance is "exceedingly intrusive." *Id.* A warrantless search is permissible in "a carefully defined set of exceptions based on the presence of exigent circumstances," such as a concern for public safety or the safety of an individual. *United States v. Bennett*, 908 F.2d 189, 192 (7th Cir. 1990) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 474-75 (1981)) (internal quotation marks omitted); *see also United States v. Richardson*, 208 F.3d 626, 629 (7th Cir. 2000) (collecting cases). Officer Conway testified that he knew that the arrests were going to occur and that the squadrol was going to be wired for surreptitious recording two to five days in advance, but that he and his colleagues did not seek a warrant. "[T]he Constitution requires that the deliberate, impartial judgment of a judicial officer be interposed between the citizen and the police." *Katz*, 389 U.S. at 357 (quoting *Wong Sun*, 371 U.S. at 481-82) (internal alterations and quotation marks omitted). As discussed above, the government does not contend that an emergency circumstance or a public safety concern that precluded the application for a warrant required the surreptitious recording of Defendants' conversation.

Given the factual differences between the rear compartment of a squadrol and the back seat of a patrol car, the Court concludes that the non-binding authority the government cites regarding expectations of privacy in a patrol car is not applicable to the present case. After carefully considering the totality of the circumstances, the Court finds that Defendants' "expectations of freedom from intrusion" into their conversation were reasonable. *See Katz*, 389 U.S. at 361 (Harlan, J., concurring). The officers infringed on Defendants' reasonable expectation of privacy by using hidden recording devices without obtaining a warrant and thus violated Defendants' basic Fourth Amendment rights. Having found the recording to be

13

unconstitutional, the Court need not address Defendants' argument that the recording was also a violation of the Fifth Amendment. The Court turns now to the appropriate scope of suppression.

## II. Whether Defendants' statements in interrogation should be suppressed

"Evidence obtained as a direct result of an unconstitutional search or seizure is plainly subject to exclusion," *Segura v. United States*, 468 U.S. 796, 804 (1984), and the Court will suppress the audio and video recordings. This exclusionary principle "extends as well to the indirect as the direct products of such invasions"; evidence that is "fruit of the poisonous tree" is subject to exclusion. *Wong Sun*, 371 U.S. at 484, 488. Defendants contend that Hummons's interview statement, which "changed radically after he was confronted" with the fact that the squadrol conversation was recorded, is an indirect product of the unlawful search and should also be suppressed. (R. 56, Defs.' Mot. at 10-11.)

The Supreme Court has rejected a "but for" causation test for suppression, holding that even evidence that would not have come to light but for an unlawful search need not automatically be suppressed. *See Wong Sun*, 371 U.S. at 487-88. "Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" *Id.* (quoting Maguire, Evidence of Guilt, 221 (1959)). "[E]vidence is not to be excluded if the connection between the illegal police conduct and the discovery and seizure of the evidence is 'so attenuated as to dissipate the taint.'" *Segura*, 468 U.S. at 805 (quoting *Nardone v. United States*, 308 U.S. 338, 341 (1939)).

Defendants argue that the causal connection between the illegal search and Hummons's statement was not sufficiently attenuated as to dissipate the taint of the police illegality. (R. 56, Defs.' Mot. at 11.) Defendants contend that "a very brief period of time elapsed" between the

recordings and their interrogations, there were no intervening circumstances, and the officers purposely and flagrantly disregarded their constitutional rights in surreptitiously recording their conversation. (*Id.* at 12-13). The government contends that the recording had no bearing on Hummons's post-arrest interview. (R. 60, Gov't's Resp. at 11.) The government maintains that the agents who interviewed Hummons had not heard the recorded conversations and did not confront him with the substance of the recorded conversation; thus, any potential connection between the recordings and Hummons's post-arrest interview is "so attenuated as to dissipate the taint." (R. 76, Gov't's Post-Hearing Mem. at 14) (quoting *Nardone*, 308 U.S. at 341). The government claims that Agent Labno's statements to Hummons were permissible bluffs. (R. 60, Gov't's Resp. at 12.) Defendants argue that the alleged "bluff" was only effective in convincing Hummons to change his statement because it was actually true. (R. 72, Defs.' Post-Hearing Mem. at 14.)

"Any application of the exclusionary rule necessarily requires consideration of society's competing interests in deterring illegal police conduct and providing juries with all of the evidence relevant to a defendant's guilt." *United States v. Liss*, 103 F.3d 617, 621 (7th Cir. 1997) (citing *United States v. Markling*, 7 F.3d 1309, 1315 (7th Cir. 1993)). The Court should balance those interests "by putting the police in the same, not a *worse*, position that they would have been in if no police error or misconduct had occurred." *Nix v. Williams*, 467 U.S. 431, 443 (1984). This case presents a close call. Agent Labno testified that he lied to Hummons when he told him that his codefendants said he owned the gun, and Agent Labno testified that confronting Hummons with the fact that the vehicle was wired for recording was a similar bluff. On cross-examination, Agent Labno conceded that the fact that the vehicle was wired was true, but clarified that he suggested that he knew more than he did, which was a bluff. These types of

15

bluffs are permissible techniques used in interrogations of suspects. *See United States v. Rutledge*, 900 F.2d 1127, 1131 (7th Cir. 1990) ("the law permits the police to pressure and cajole, conceal material facts, and actively mislead"). Agent Labno testified that he was not told about the contents of the recorded conversation and that he did not confront Hummons with any specifics from the conversation. Although Defendants would like the Court to conclude that Agent Labno actually confronted Hummons with the content of Defendants' conversation in the squadrol, (R. 72, Defs.' Post-Hearing Mem. at 14), the Court declines to assume, based on nothing more than inferences, that Agent Labno committed perjury.

It is conceivable that Agent Labno would have told Hummons that the vehicle was wired even if it was not—that he would have come up with that lie or "bluff" just as he came up with the statements he told Hummons the other defendants made. If that was the case, Hummons's statement was not come at by exploitation of the unlawful search. It is also conceivable that Agent Labno told Hummons the squadrol was wired because the squadrol was, in fact, wired. However, Defendants do not claim that Hummons made his incriminating statement because Agent Labno told him about the unlawful search. Hummons may have made the same statement if he had only been confronted with the false or true statements of his codefendants. He may have made the same statement if he had been told that he had met with undercover agents to plan the robbery and that those agents had taped his conversation. The link between the unlawful search and Hummons's statement is therefore too attenuated to require suppression of the statement. *See Segura*, 468 U.S. at 805; *see also Nix*, 467 U.S. at 443. The Court thus concludes that the competing interests in deterring illegal police conduct and making probative evidence available to the fact-finders is properly resolved by suppressing the recordings themselves but allowing Hummons's statement to be admitted. It would put the officers in a worse position than

if no police misconduct had occurred if the Court suppressed Hummons's statement just because the existence of the unlawful recording—not its content—*may* have driven Agent Labno to make claims that *may* have caused Hummons to confess. See *Nix*, 467 U.S. at 443.

Defendants encourage the Court to consider the "disciplinary purpose of the exclusionary rule." (R. 72, Defs.' Post-Hearing Mem. at 13.) According to Defendants, the primary purpose of the exclusionary rule is to deter future disregard for unconstitutionality, not to repair damage that has already occurred. (*Id.*) (quoting *United States v. Calandra*, 414 U.S. 338, 347 (1974); *Elkins v. United States*, 364 U.S. 206, 217 (1960)). Defendants contend that "[t]o suppress the surreptitious recordings without suppressing the statements they were used to obtain would be to deprive that decision of any real effect. A.T.F. agents would feel confident that they could continue their method of using unconstitutionally obtained recordings to elicit statements from suspects." (R. 72, Defs.' Post-Hearing Mem. at 15.) The Court shares Defendants' concern about the potential deterrent effect of its ruling. In this case, however, the Court finds that suppressing Hummons's statement would be unduly punitive. The Court would not hesitate to suppress Hummons's statement if it was "come at by exploitation of the illegal search," *Wong Sun*, 371 U.S. at 487-88, but the Court refuses to rely on inferences and speculation to find that the statement was the fruit of the unlawful recording. Accordingly, the Court will suppress the recordings and will allow Hummons's interview statement to be introduced into evidence. Like Defendants, however, the Court is concerned that the ATF is seeking "to create a systematic end run around the basic constitutional protections afforded criminal defendants by the Fourth and Fifth Amendments," (R. 72, Defs.' Post-Hearing Mem. at 17-18), and the Court cautions law enforcement agencies to ensure that criminal suspects are afforded their full constitutional rights.

## CONCLUSION

For the reasons set forth above, Defendants' motion to suppress evidence (R. 56) is GRANTED IN PART and DENIED IN PART.

ENTERED: _____
Chief Judge Rubén Castillo
United States District Court

Dated: February 18, 2014